In the Interest of S——— A——— J——— and S——— L——— J———, children under seventeen years of age.

**Perry W. EPPERLY, Chief Juvenile Officer of Greene County, Missouri, Respondent,**

v.

**E——— G. J———, Appellant.**

**No. 17275.**

Missouri Court of Appeals, Southern District, Division One.

Sept. 30, 1991.

Motion for Rehearing or to Transfer to Supreme Court Denied Oct. 22, 1991.

Application to Transfer Denied Dec. 17, 1991.

---

Scott B. Tinsley, Springfield, for appellant.

Kay A. Van Pelt and F. Richard Van Pelt, Springfield, for respondent.

CROW, Judge.

On April 11, 1989, the Chief Juvenile Officer of Greene County commenced a proceeding to terminate the parental rights of H___ S___ J___ C___ and her former husband, E___ G. J___, to their daughter, S___ A___ J___, born September 23, 1982, and son, S___ L___ J___, born August 16, 1984. For convenience, we henceforth refer to the daughter as "A___" and the son as "L___."

The trial court heard four days of evidence. The father (E___ G. J___), henceforth referred to as "appellant," appeared in person and with counsel, and vigorously resisted termination. The mother, henceforth referred to as "H___," was evidently served by publication. H___ failed to appear at any time during the termination proceeding.

On November 9, 1990, the trial court entered an order terminating the parental rights of both parents to both children. Appellant brings this appeal from that order. H___ did not appeal.

Inasmuch as appellant challenges the sufficiency of the proof to justify termination, a summary of the prodigious evidence is required. In synopsizing it, we observe the well established rule that the evidence and all reasonable inferences which may be drawn from it are considered in the light most favorable to the judgment. *In the Interest of W.D.T.*, 785 S.W.2d 286, 287 (Mo.App.1990); *In the Interest of B.C.H.*, 718 S.W.2d 158, 160[6] (Mo.App.1986); *In re B.G.S.*, 636 S.W.2d 146, 148[2] (Mo.App.1982).

So viewed, the evidence establishes that on September 23, 1986, appellant and H___, then husband and wife, were living together in Greene County, Missouri. Their two children were living with them. On that date, H___, a member of United States Naval Reserve, departed for a "specialist school" in San Diego, California. Because appellant worked at night, H___ arranged for Brenda Pearson to take care of the children in her absence. The children were customarily with Ms. Pearson from 3:30 p.m., until 7:45 a.m., the next day.

On a date which appears to have been Tuesday, November 4, 1986, while H___ was still in California, Ms. Pearson informed appellant that A___ had said appellant "was playing with her pee-pee and showing her brother, [L___], how to play with her pee-pee." Appellant telephoned Daniel V. Taub, a clinical psychologist, and told him of the allegation. On the advice of Taub, appellant scheduled an appointment for A___ to be evaluated by Dr. Joyce Tinsley at Burrell Mental Health Center. The appointment was for Thursday afternoon, November 6.

At 8:50 p.m., November 4—the day Ms. Pearson informed appellant about A___'s allegation—a social service worker of the Missouri Division of Family Services ("DFS") received a "hot line" call regarding the allegation. Because of the lateness of the hour and an assumption the children were safe with Ms. Pearson, the DFS worker and her supervisor decided to leave the children with Ms. Pearson overnight. They asked her to bring the children to the Juvenile Office the next day.

Ms. Pearson brought both children to the Greene County Juvenile Office Wednesday, November 5, 1986. Deputy Juvenile Officer Marilyn Gibson interviewed A___ using "anatomically correct" dolls. While A___ was naming the parts of the body on the male doll, A___ remarked: "Dad had hair. [L___] did not." Ms. Gibson testified:

"... [A___] started talking about daddy pinched and pulled at her pee-pee; and she took her hand and was kind of doing a pinching motion....

She ... said, 'It hurt.' And ... she did a thing where she kind of took her hand like this and put her finger and was going like that. And I said, 'Well, when did that happen?' or 'What was going on?' And that's when she said that that's when he sat on top of her, and he had taken her shirt off and didn't have his clothes on.

....

[S]he did also indicate to me that dad had wanted her to lick [L___'s] pee-pee,

and that's when she kind of did the tongue movement, and she said something about, 'That was nasty.'

And then I said, 'Did she ever have to kiss dad anywhere?' ... And she said 'that he had wanted her to kiss him on his pee-pee and that he had wanted to kiss her on her pee-pee.'"

At the conclusion of the interview, Ms. Gibson took protective custody of both children. She informed appellant of this between 5:30 and 6:30 p.m., that day (November 5) and requested him to come to the Juvenile Office the next day.

On November 6, 1986, Ms. Gibson filed a petition asking the Juvenile Division of the Circuit Court of Greene County to take jurisdiction of A____ and L____ per § 211.031.1(1)(a), RSMo 1986. We henceforth refer to this proceeding as "the neglect case." The petition in the neglect case averred the children's physical, emotional, mental and moral well-being was in jeopardy because of appellant's inappropriate sexual contact and behavior involving them. The Juvenile Division found probable cause to believe it would be required to take jurisdiction and entered an order placing both children in the temporary legal custody of DFS.

The day the neglect case was filed (November 6), appellant, then age 41, kept his appointment with Ms. Gibson. A deputy sheriff and Sarah King, a DFS social worker, also attended the meeting. According to Ms. Gibson, appellant was upset, tearful, and angry because the children had been removed from his custody.

Appellant informed Ms. Gibson about A____'s appointment with Dr. Tinsley that afternoon. Ms. Gibson stated Dr. Roy Grando would see A____.

At appellant's request, Ms. King cancelled A____'s appointment with Dr. Tinsley. Ms. King recalled appellant expressing a willingness to see Dr. Grando. Ms. King added, "[Appellant] denied that he had done anything to hurt his daughter."

According to a medical report, A____ was examined "for sexual abuse" on No-

vember 6, 1986, by a pediatrician. A notation on the report reads: "No evidence of abuse or neglect."

Dr. Grando, a psychologist, performed an evaluation of A____ November 7, 1986. Dr. Grando testified:

"[A____] said something along the lines of, 'Daddy rubbed my pee-pee.' I asked her ... what was happening in that situation, and she told me that she had gone into her father's bedroom and lie [sic] down on the bed next to him, and then that he rubbed her pee-pee. She identified as she had identified on a doll with anatomical parts that the pee-pee was the pubic area of the doll. And I asked her ... what her father rubbed her with, and she said, 'His hand.' ...

... She made a statement that she was wearing a nightgown.... And she said that her father was under the covers but he ... didn't have any clothes on.

....

Q. ... Based on your observations and your discussion with [A____], were you able to come to a conclusion or at least an opinion as to whether [she] had been sexually abused?

A. Yes, I was.

Q. And what was that opinion?

A. That she'd been sexually abused by her father."

H____ returned from California by airplane Monday morning, November 10, 1986.[1] Although the record is murky, appellant evidently met H____ at the airport. H____ later reported to a DFS worker that while she and appellant were in an automobile, appellant struck her, inflicting bruises. H____ notified police about the incident and did not return to the marital home.

According to appellant, he checked himself into a hospital for "severe depression" later that day (November 10). He remained there about eight days.

On November 13, 1986, an obstetrician/gynecologist examined A____. His report reads:

---

1. We learn this from Juvenile Office Exhibit 101, the "Narrative Section" of the DFS record in the case. No error is assigned in this appeal regarding its receipt in evidence.

"External genitalia: Hymen is perfectly intact—there is no tear present in the entire circumference & no abrasions are present.

There is a small O sized red area just to the right of the hymeneal ring at 9 o'clock—which could be due to allergy or irritation.

There is no clinical evidence present of sexual abuse."

Nancy Bell, a "treatment worker" for DFS, was assigned the case when the children were placed in DFS custody. Appellant phoned Ms. Bell November 18, 1986, stating he was being released that day from the hospital and wanted to visit the children, who had been in foster care since November 5. A visit was scheduled for November 25 at the DFS office.

During the next few weeks, H_____ and appellant (separately) visited the children on scheduled occasions under DFS supervision.

According to appellant, H_____ filed a petition for dissolution of marriage December 16, 1986.

On January 22, 1987, the Juvenile Division of the Circuit Court, henceforth referred to as "the trial court," held a hearing on the issue of jurisdiction in the neglect case. Appellant appeared in person and with counsel.[2] H_____ appeared by counsel, but not in person. The children were represented by their guardian ad litem, a lawyer.

At the outset of the hearing, Deputy Juvenile Officer Gibson filed a second amended petition. It averred the children were without adequate and proper care, custody, support, supervision and parenting, and that their physical, emotional, mental and moral well-being was in jeopardy by reason of A_____'s revelations about appellant. It further pled appellant agreed the children were in need of the care, treatment and services of the court, but that he denied having sexual contact with A_____. Additionally, it averred H_____ had failed,

neglected or refused to provide a home for the children since returning from California.

H_____'s lawyer stipulated H_____ had failed to provide a home for the children. Appellant's lawyer stipulated A_____ had complained that appellant "or some adult" had made sexual contact with her and appellant had failed to prevent such situation, being unaware of it. According to Ms. Gibson, the purpose of the latter stipulation was to prevent A_____ from undergoing the stress of testifying. On the basis of the stipulations, the trial court found it had jurisdiction over the children under § 211.031.1(1), RSMo 1986.

The trial court immediately addressed the issue of disposition. On the recommendation of Ms. Bell, and without objection by any party, the trial court ordered that both children remain in temporary legal custody of DFS with placement in approved foster care. The trial court ordered DFS to prepare a treatment plan.

On January 30, 1987, Deputy Juvenile Officer Gibson again interviewed A_____. The interview was recorded on videotape. During the interview, A_____ stated appellant scratched her with the tip of his finger. Simultaneously with this disclosure, A_____ pointed to her genital area. She also stated appellant pinched her on her "pee-pee," and again she simultaneously pointed to her genital area. A_____ added that appellant pinched L_____ on his penis. She demonstrated these acts using anatomically correct dolls, which she undressed.

In early February, 1987, appellant had a counseling session with Dr. Grando. Appellant denied sexually abusing A_____. Grando attempted to help appellant understand that an adult who sexually abuses a child cannot be successfully counseled unless the adult admits the abuse. Appellant did not return to Dr. Grando for further counseling.

A written treatment plan dated February 10, 1987, was prepared by Ms. Bell of DFS and presented to the trial court in the neglect case. The plan assigned the following responsibilities to appellant.

---

**2.** The lawyer representing appellant in this appeal was not the lawyer who represented appellant in either the neglect case or the instant case in the trial court.

1.   He will accept services from DFS and cooperate with DFS by informing the assigned social service worker of his current circumstances, whereabouts and living arrangements.

2.   He will maintain independent, stable, safe and adequate housing suitable for himself and the children.

3.   He will actively participate in counseling sessions with an approved counselor, the frequency of which will be determined by the counselor.

4.   He will request regular visitation with the children, under supervision by DFS.

5.   He will be responsible for payment of A_____'s preschool fee.

6.   He will actively participate in parenting classes appropriate to the ages and needs of the children.

7.   He will obtain a psychological evaluation by Frank Bartlett.

Appellant, by counsel, requested a hearing on the plan.

Appellant was seen by Frank Bartlett, a clinical psychologist, on April 27 and May 7, 1987. Bartlett informed DFS appellant was angry, hostile and critical of "the system." According to Bartlett, "The clinical scale configuration is that of an individual who is passively unconventional, who is rebelling against social conventions and mores, and who delights in defying and challenging any form of rule or regulation." Bartlett concluded the prognosis for significant change was poor. In Bartlett's opinion, appellant needed "long-term individual psychotherapy geared at uncovering the roots of his enormous amount of anger, helping him deal with those roots, and helping him to develop alternative ways of responding to others and his environment."

By the end of May, 1987, DFS had not heard from H_____ for several weeks. On June 5, 1987, H_____'s lawyer filed a motion for leave to withdraw in the neglect case, averring H_____ had failed to keep counsel informed of her whereabouts and counsel was unable to contact H_____.

On June 26, 1987, appellant went to the DFS office and spoke to Ms. Bell and her supervisor, Joan Wagner. Appellant stated he once had a drinking problem but he "had been dry for six months." Ms. Wagner asked appellant if, during the time he was drinking, there was a possibility he could have touched A_____ in a sexually inappropriate way. Appellant replied, "It's possible."

At the insistence of DFS, appellant saw Kenneth Burstin, a clinical psychologist, on August 3, 12 and 19, 1987, for counseling. A report by Burstin states the objective of DFS in recommending counseling was for appellant to admit he was sexually inappropriate with his children and work on the problems which led to such behavior. Appellant steadfastly denied to Burstin any sexually inappropriate behavior toward the children. Burstin's report continued: "[Appellant] has consistently maintained that his daughter was manipulated into lying about him, and despite my expressions of wonderment that [A_____] could have been convinced to do so, he has remained adamant in asserting his innocence." Burstin added that appellant was "strongly disinclined towards therapy."

On September 1, 1987, the trial court held a hearing on the treatment plan of February 10, 1987, in the neglect case. Appellant appeared in person and with counsel; the children were represented by their guardian ad litem. H_____ did not appear. The trial court found the plan reasonable and appropriate, and ordered it implemented "retroactive to February 10, 1987." Pursuant to § 210.720, RSMo 1986, the trial court scheduled a hearing for October 13, 1987, to review the disposition of the children.

The dispositional review hearing took place on schedule. Appellant appeared in person and with counsel; the children were represented by their guardian ad litem. Again, H_____ failed to appear. Testimony was received from several witnesses, including appellant. His testimony included this [3]:

---

**3.**   At the start of the trial in the instant case, appellant's lawyer asked the trial court to take judicial notice of the record in the neglect case, including the transcripts of the hearings. The trial court granted the request. Those transcripts are included in the record on appeal.

"Q. Mr. [J____], I noticed in this report from Dr. Frank Bartlett ... that you indicated that [A____] is not your biological child; is that correct?

A. That is correct.

Q. Okay. And that Mrs. [J____] was pregnant before you met her or before you married?

A. Before we were married.

Q. Do you know who her biological father is?

A. All I knew is that he was a sergeant working in weapons in the Marine Corps.

Q. Okay. And you've never claimed to be her biological father, but rather to say presumptive legal father; is that correct?

A. She's my daughter."

Ms. Bell of DFS testified the issues that led to the children's removal had not been dealt with and there was insufficient progress to show the children would be safe in appellant's home.

At the conclusion of the evidence, the trial court continued the children in temporary legal custody of DFS.

Thereafter, appellant continued to have visits with the children, supervised by DFS. The visits were evidently of two hours' duration, twice a month. Eventually, they were changed to one hour per week.

Sometime in October, 1987, a different DFS caseworker, Andrea Murray, was assigned the case. Ms. Bell, the original caseworker, testified that because of appellant's hostility, she and her supervisor determined it would be in everyone's best interest to assign another worker, as possibly appellant had a problem working with her.

DFS referred A____ to Angela M. Wessell, a psychologist, for a psychological evaluation. Wessell first saw A____ March 31, 1988. A____ told Wessell appellant had tried to place his penis in her.

Wessell saw A____ April 19, April 26, and May 3, 1988. On the April 26 visit, and again on the May 3 visit, A____ told Wessell about appellant's conduct. According to Wessell, all three accounts were consist-

ent. Wessell found this significant, as children under age six are usually unable to fabricate a story and be consistent with it. Wessell added that A____ described appellant's penis as "in between being soft and hard, and it was peach in color." Wessell said such a description would be unusual if a child had not seen the anatomy of an adult male. Wessell's testimony included this:

"Q. Were you able to draw a conclusion or opinion about [A____] being sexually abused by this evaluation?

A. Yes.

Q. And what is that opinion?

A. My opinion is that she was sexually abused and that she had named her father as the perpetrator, and I have an opinion that I believe her."

On May 26, 1988, the trial court held another dispositional review hearing in the neglect case. Appellant appeared in person and with counsel; the children were represented by their guardian ad litem.

Caseworker Murray testified the children were well adjusted in their foster home. Ms. Murray recommended the children remain in custody of DFS in foster care. Asked whether the children had ever discussed sexual abuse with her, Ms. Murray described an incident after a visit by appellant with the children in January, 1988. Ms. Murray quoted A____ as saying she "loved her daddy, but she wished he wouldn't hurt her anymore."

Ms. Murray submitted a new treatment plan similar to the earlier one except condition 3 required appellant to actively participate in counseling sessions with a counselor approved by the Juvenile Office, the children's guardian ad litem, and DFS, with counseling to focus on the issue of sexual abuse. The plan called for visits by appellant with the children twice a month instead of weekly, supervised by DFS.

Dr. Grando testified at the May 26, 1988, hearing. He related he had seen A____ September 15, 1987, September 28, 1987, and October 6, 1987. He made a diagnosis of posttraumatic stress disorder. Asked if

he had drawn any conclusions about the reason for such condition, Grando replied, "I concluded that her father had sexually abused her." Grando's testimony continued:

"Q. ... If you were told that the child's father had never actively dealt with the issue of sexual abuse of [A____] in counseling, never admitted it and never addressed it, what would be your recommendation in regard to placing her back in the home of that parent?

A. That she should not be placed back in that parent's home.

Q. And what is the basis for that?

A. First, I believe that she was sexually abused by that parent and that that parent needs to work on those issues and resolve them in order to for him to be safe in terms of taking care of her and not sexually abusing her again."

At the conclusion of the May 26, 1988, hearing, the trial court ordered that the children remain in temporary legal custody of DFS.

On June 29, 1988, appellant filed a pro se "civil rights complaint" in the United States District Court, Western District of Missouri, against the Chief Juvenile Officer, Deputy Juvenile Officer Gibson, the Director of the Greene County office of DFS, Ms. King, Ms. Bell and Ms. Murray of DFS, Dr. Grando, psychologists Bartlett and Burstin, and the children's guardian ad litem. The complaint averred the defendants had deprived appellant of constitutional rights, privileges, and immunities by illegally taking his children from the custody of a baby-sitter and keeping them illegally. The complaint sought a half million dollars in damages from each defendant, and other relief.

On July 14, 1988, the trial court, at appellant's request, heard additional evidence on the issue of disposition in the neglect case. Appellant appeared in person, without counsel—his lawyer had withdrawn after appellant filed the civil rights suit. The children were represented by their guardian ad litem.

Appellant denied sexually abusing A____, and characterized the videotape interview of A____ by Deputy Juvenile Officer Gibson January 30, 1987, a "farce." Appellant presented testimony from Ms. King, Ms. Bell and Ms. Murray of DFS, and from psychologist Taub, whom appellant had contacted when Ms. Pearson informed appellant of A____'s allegation November 4, 1986. Taub had given appellant the Minnesota Multiphasic Personality Inventory in November, 1987, and had counseled him on other occasions.

At the conclusion of the July 14, 1988, hearing, the trial court ordered that the children remain in temporary legal custody of DFS. The trial court approved the treatment plan presented at the May 26, 1988, hearing.

On July 21, 1988, at appellant's request, the trial court held a hearing on the treatment plan approved a week earlier. Appellant appeared in person, without counsel. The children were represented by their guardian ad litem.

Appellant objected to the provision in the plan that counseling would focus on issues related to sexual misconduct by him and any related issues deemed necessary by the therapist. Appellant protested the provision for two visits with the children per month, reminding the trial court he had been visiting them four times a month. Additionally, he complained about a provision making him responsible for payment for his counseling "for an illness I do not have."

The trial court approved the treatment plan and ordered it implemented.

Entries in DFS records indicate the marriage of appellant and H____ was dissolved August 26, 1988. When appellant visited the children September 28, 1988, he showed them a picture of a lady, L____, and informed them he had married her September 23, 1988.

Thereafter, on November 17, 1988, March 2, 1989, and March 22, 1989, appellant presented other pro se requests to the trial court in the neglect case. They included a motion to disqualify the judge (the third judge who had been involved in the case), and to disqualify the DFS worker, the children's guardian ad litem, and others.

As noted in the first paragraph of this opinion, the petition to terminate parental rights was filed April 11, 1989. Both before and after its filing, appellant continued to visit the children at scheduled times, supervised by DFS.

On August 1, 1989, Deputy Juvenile Officer Gibson conducted a second videotaped interview with A——, who was scheduled to enter the first grade when school began. When Ms. Gibson steered the conversation to the suspected sexual abuse, A—— related appellant got on top of her when both were unclothed. She pointed between her legs—an area she called her "privacy"—and said appellant touched her there with his hand. She also pointed to the inside of her thigh and said he touched her there with his pee-pee. According to A——, these acts occurred when her mother was on her long trip.

Ms. Gibson asked A—— if there was anything she would like to tell the judge. A—— replied she did not want to go home because appellant would probably do it again. Ms. Gibson asked what "it" was. A—— replied, "My privacy."

Although the record is vague, it appears that on February 22, 1990, an order was entered in the neglect case suspending visits between appellant and the children. At trial in the instant case, appellant testified he had last seen his children in January, 1990.

On March 7, 1990, A—— wrote a letter to the judge in the instant case and handed it to Ms. Murray of DFS for delivery. The letter reads:

"Dear Judge
don't believe E[——].[4] your a very nice Judge. I don't want to live with E[——]. I don't trust E[——]. I don't like him.
    from,
    [A——]"

Appellant's brief presents three points relied on; we address the third one first. Pertinent to it, § 211.447, RSMo Cum.Supp. 1990, reads:

" . . . .

2. The juvenile court may terminate the rights of a parent to a child . . . if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:

. . . .

(2) The child has been adjudicated to have been abused or neglected. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:

. . . .

(c) A severe act or recurrent acts of . . . sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or
. . . ."

In its order terminating parental rights, the trial court found:

" . . . there was clear, convincing, and cogent evidence presented establishing that one or more severe acts of sexual abuse occurred to [A——]. That these acts of sexual abuse were perpetrated by [appellant]. That the acts of sexual abuse consisted of, but are not limited to, touching [A——'s] vagina with his fingers and rubbing his penis on or around her vaginal area."

▮ Appellant's third point maintains there was no clear, cogent and convincing evidence to support the above finding. Appellant avers (a) the initial accusations of sexual abuse surfaced during a period of considerable domestic turmoil involving the disintegration of the parents' marriage and the absence of significant contact by A—— with her mother, (b) A——'s allegations lacked consistency "at various points in time," (c) there was no physical evidence of sexual abuse, and (d) A—— was exposed to sexual activity at a foster home prior to her evaluation by psychologist Wessell.

---

**4.** There was evidence A—— referred to appellant by his nickname, E——.

As to contention "(a)," appellant directs us to his testimony that while H_____ was in California for Naval Reserve training in October, 1986, H_____ ceased telephone contact with him and it became increasingly evident the marriage was doomed. Appellant testified that A_____ talked to H_____ during this period, and afterward said, "Daddy, my mommy says she doesn't know if she's coming home or if she'll ever come home."

The trial court was not obliged to believe appellant's testimony regarding what A_____ said. In this judge-tried case, credibility of the witnesses and the weight to be given their testimony was a matter for the trial court, which was free to believe none, part, or all of the testimony of any witness. *Herbert v. Harl*, 757 S.W.2d 585, 587[1] (Mo. banc 1988); *In Interest of R.H.S.*, 737 S.W.2d 227, 236 (Mo.App.1987). On credibility issues, we may not substitute our judgment for that of the trial court, which was in a better position to not only judge the credibility of witnesses directly, but also their sincerity and character as well as intangibles which may not be reflected in the record. *State ex rel. Webster v. Cornelius*, 729 S.W.2d 60, 65[5] (Mo.App.1987); *Longmier v. Kaufman*, 663 S.W.2d 385, 390–91[6] (Mo.App.1983).

Furthermore, appellant directs us to no evidence supporting his theory that A_____ made the sexual abuse accusation because she feared her mother was not returning. He offers no explanation as to why the marital rift would motivate A_____ to falsely accuse him of such behavior.

Regarding appellant's contention "(b)," we note that while A_____'s accounts of the sexual abuse were not identical, the differences were relatively minor considering her age and the passage of time between her initial revelation and later ones. It is also noteworthy that Dr. Grando and psychologist Wessell were convinced A_____'s accounts of the sexual abuse were true.

Appellant's contention "(c)" is likewise unpersuasive. Given the nature of the sexual abuse described by A_____, it is unlikely any physical evidence would have been present. Psychologist Wessell explained:

"In a lot of the cases I've worked with, they do have an exam done; and many of these children don't have any physical evidence, according to the physical exam by the MD. Because most of the time the abuse is ... rubbing, fondling, digital rather than intercourse; so that's not untypical with the younger child." Dr. Grando testified, "Most sexual abuse cases that I've worked on don't have any supporting physical evidence that sexual abuse has occurred."

Contention "(d)" is based on an entry in DFS records dated September 25, 1987, regarding the foster home in which A_____ and L_____ were then residing. The entry states the home was being investigated because the 14–year–old son of the foster parents was engaged in sexual activity with an 8–year–old child in the home. The report indicates the activity may have occurred in the presence of other children in the home.

This matter was fully aired at trial. A DFS investigator testified she found no indication that any children except the two participants in the activity were present when it occurred. One of the foster parents testified A_____ and L_____ were asked about the activity and stated they knew nothing about it. Psychologist Wessell testified that in her sessions with A_____, nothing came out about A_____ observing sexual activity in a foster home. Wessell avowed it would be very unlikely that a child A_____'s age could fabricate a story that she was sexually abused based on observing sexual activity of others.

The requirement of clear, cogent and convincing evidence is met when the evidence instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true. *In re Adoption of W.B.L.*, 681 S.W.2d 452, 454[4] (Mo. banc 1984). This standard of proof may be met although the court has contrary evidence before it. *Id.* at 454[5].

Here, A_____'s accounts of the sexual abuse were buttressed by the opinions of Dr. Grando and psychologist Wessell, and

arguably by appellant's concession to Ms. Bell and Ms. Wagner of DFS on June 26, 1987, that it was possible he could have touched A＿＿ in a sexually inappropriate way during the time he was drinking. Psychologist Taub, a witness for appellant in both the neglect case and the instant case, conceded his testing of appellant "would not show whether or not someone is a child molester."

We hold the requirement of clear, cogent and convincing evidence was met regarding the sexual abuse allegation in the instant case. There was no suggestion A＿＿ had any motive to falsely accuse appellant or that anyone induced her to do so. Her initial revelation was made to the baby-sitter, Brenda Pearson. While the circumstances under which A＿＿ made the disclosure to Ms. Pearson are not shown, there is no indication Ms. Pearson was hostile toward appellant or had any reason to start trouble for him. Indeed, Ms. Pearson told appellant of A＿＿'s disclosure before reporting it to anyone else.

There is ample evidence that A＿＿ was not coached on what to say in her sessions with Deputy Juvenile Officer Gibson, Dr. Grando and psychologist Wessell. The two videotaped interviews demonstrate Ms. Gibson scrupulously avoided guiding A＿＿ through the accounts of appellant's acts.

The trial court had the opportunity to observe appellant during four days of trial. The trial court obviously disbelieved appellant's denials of sexual abuse. That was the trial court's prerogative. Appellant's denials do not render the evidence insufficient to meet the clear, cogent and convincing standard. *W.B.L.*, 681 S.W.2d at 454[5].

Appellant also argues the evidence failed to show a "severe" act of sexual abuse as required by § 211.447.2(2)(c), RSMo Cum.Supp.1990. Appellant cites one case: *In Interest of J.C.G.*, 743 S.W.2d 449 (Mo.App.1987). Appellant, as we grasp his argument, maintains that even if A＿＿'s accounts of sexual abuse are true, such abuse was not as severe as that in *J.C.G.*

We agree the sexual abuse shown here was not as barbaric as that in *J.C.G.* However, that does not mean it was not severe

within the meaning of § 211.447.2(2)(c), RSMo Cum.Supp.1990. We hold that on the evidence here, the trial court could properly find the sexual abuse was sufficiently flagrant to be "severe" within the meaning of that statute.

Appellant's third point also avers the trial court failed to set forth a sufficient factual basis for the sexual abuse finding. The point does not explain wherein and why this is so, no clue is supplied in the argument, and no case is cited in support of the contention. We hold the contention is abandoned. *Perez v. Boatmen's National Bank of St. Louis*, 788 S.W.2d 296, 301[14] (Mo.App.1990); *Boswell v. Steel Haulers, Inc.*, 670 S.W.2d 906, 912[6] (Mo. App.1984).

Appellant's third point is denied.

We next address appellant's first point. Section 211.447.2(3), RSMo Cum.Supp.1990, is pertinent to it. Such provision authorizes termination of parental rights if the court finds termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that:

"The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

(a) The terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a

continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

...."

In its order terminating parental rights, the trial court addressed the subjects set forth in the above statute. The trial court found A_____ and L_____ had been under the jurisdiction of the juvenile court for more than one year and the conditions which led to the assumption of jurisdiction still persisted, or conditions of a potentially harmful nature continued to exist. The trial court further found there was little likelihood that such conditions would be remedied at an early date so the children could be returned to their mother or appellant in the near future. Additionally, the trial court found the continuation of the parent-child relationship greatly diminished the children's prospects for early integration into a stable and permanent home. The trial court's findings continued:

"a. The progress made by the parent in compliance with the Social Service Plan (Treatment Plan).

(1) That ... two Social Service Plans (Treatment Plans) were ordered implemented for [appellant].

(2) That ... [appellant] [was] aware of the conditions and responsibilities of these plans.

....

(5) That [appellant] has complied in part and failed in part to complete both Social Service Plans ordered by this Court. [Appellant] has failed to comply as follows:

(a) [Appellant] agrees to accept services from Greene County Division of Family Services and to make every effort to cooperate with them.

Sufficient testimony was presented establishing [appellant] was uncooperative and hostile throughout the time that the said minor children were placed in alternative care. [Appellant] testified he had personality conflicts and disagreements with the Division of Family Services staff and the Greene County Juvenile Office. The record and testimony indicate that [appellant] attempted to have the majority of workers removed due to conflicts.

(b) [Appellant] will attend and actively participate in counseling sessions with a counselor approved by the Juvenile Office, the Guardian ad Litem, and Family Services. The counselor will determine the frequency of counseling sessions.

Evidence was presented to establish that [appellant] failed to actively participate in counseling with an approved counselor. Evidence was presented that indicated [appellant] decided as early as February, 1987, that he did not need counseling. Testimony also indicated [appellant] continued to hold that belief.

b. The success or failure of the efforts of the Juvenile Officer, the Division of Family Services, or other agencies to aid the parents on a continuing basis in adjusting their circumstances or conduct to provide a proper home for the said minor children. Multiple services were provided ... [appellant] of which [he] either refused to accept or failed to appear.

...."

■ Appellant's first point avers the trial court erred in finding: (1) the conditions which led to the assumption of jurisdiction still persisted, or conditions of a potentially harmful nature continued to exist, (2) there was little likelihood such conditions would be remedied at an early date so the children could be returned to appellant, and (3) continuation of the parent-child relationship greatly diminished the children's prospects for early integration into a stable and permanent home. Appellant maintains such findings were not supported by clear, cogent and convincing evidence, particularly considering (a) the extent to which appellant made progress in complying with the social service plan, (b) the unreasonable and inappropriate terms of the plan in requiring appellant to admit sexually inappropriate conduct in order to continue counseling, (c) the conduct and circumstances of appellant in establishing a proper home for the children, (d) appellant's consistent exercise of visitation with the children, and (e) the fact that any diminution in emotional ties of the children to appellant were a

function of extended foster care and reduced visitation brought about by DFS and not by any act of appellant.

■ Appellant begins his argument under this point by listing the requirements of the treatment plans with which he complied. This begs the question. As we have seen, the trial court found appellant had complied in part with the plans. However, mere participation in a treatment plan is not sufficient to bar termination. *R.H.S.,* 737 S.W.2d at 236. A parent must make a commitment to change the course of conduct which necessitated removal of the children. *Id.*

The plans required appellant to accept services from, and cooperate with, DFS. The record is replete with evidence that from the outset, appellant was hostile, adversarial and noncooperative. He accused DFS personnel of bias, complained to their superiors, and sued them. Appellant reduced the relationship between himself and DFS to a test of wills instead of a cooperative effort to solve the problems that necessitated removal of the children from his custody.

According to psychologist Bartlett, appellant stated on May 7, 1987, that he considered the psychological evaluation by Bartlett a form of harassment by DFS. Bartlett added that in the frame of mind manifested by appellant, it was unlikely any progress could be made toward resolving problems and issues between appellant and others, inasmuch as appellant projected all blame onto others for his problems. In August, 1987, psychologist Burstin reported to DFS that appellant was "strongly disinclined towards therapy."

At trial, appellant conceded he did not participate in counseling sessions with a counselor approved by the Juvenile Office, DFS, and the children's guardian ad litem, such counseling to focus on issues related to his alleged sexual misconduct. Appellant says his failure to do so was justified because DFS imposed a requirement that he admit the sexual abuse in order to proceed with counseling.

Appellant appears to misunderstand what DFS hoped to achieve.

Dr. Grando testified that if a parent suspected of sexual abuse denied it, Grando would try to work with the parent for a period of time, and somewhere in the counseling process he would work toward an admission of the abuse. According to Grando, if the parent admitted sexual abuse, was cooperative, and everything went ideally, it would be possible to reunite a family within three months. The report of psychologist Burstin stated the *objective* of DFS in recommending counseling was for appellant to admit he was sexually inappropriate with his children and work on the problems which led to such behavior. Ms. Bell of DFS testified the purpose in recommending counseling for appellant with Burstin was for appellant to admit the sexually inappropriate behavior, inasmuch as that was the only way DFS could see progress toward resolving the problem.

Appellant's position seems to be that an admission of sexual abuse was a threshold requirement for *receiving* counseling. On the contrary, the record suggests that an admission of the abuse was an objective to be pursued *through* counseling, so that the causes of the behavior could be addressed and treated. Successful treatment was essential in pursuing the goal of returning the children to appellant and ensuring the danger of sexual abuse no longer existed.

Had appellant undergone the required counseling, and had the counselors ultimately concluded he had not engaged in sexual abuse, we assume DFS and juvenile officials would have reevaluated the case. However, that did not occur, and the trial court, as fact finder, found the sexual abuse had indeed occurred—a finding which we have held is supported by clear, cogent and convincing evidence.

As no progress was ever made in resolving the sexual abuse problem, it is evident that at time of trial in the instant case the conditions which led to the assumption of jurisdiction still persisted and there was little likelihood they would be remedied at an early date. While appellant's marriage to his present wife, his establishment of a new household, and his persistence in visiting the children were positive steps, they

did not resolve the fundamental problem of sexual abuse of A_____ and L_____. That problem was no nearer solution at time of trial in 1990 than it was when the abuse surfaced in November, 1986.

Ms. Murray of DFS testified she observed no emotional ties between the children and appellant. Appellant attributes this to the extended period the children were in foster care. He asserts this illustrates what has long been recognized as the inherent weakness of the judicial system's ordinary procedures to deal with termination of parental rights—the natural delay in arriving at a final determination. *D.G.N. v. S.M.,* 691 S.W.2d 909, 913–14 (Mo. banc 1985). Appellant reminds us, as explained in *D.G.N.,* that every day a child in its formative years is left in a stable parent-child relationship, natural or foster, the greater the potential for harm to the emotional well-being of the child should it be necessary to order a change of custody. *Id.* at 914.

This is undoubtedly true. However, in the circumstances here, the trial court in the neglect case had no alternative to foster care so long as the sexual abuse problem remained unresolved. In the instant case, the trial court found, "[Appellant's] lack of treatment for the sexual misconduct, anger, and hostility, is potentially harmful to said minor children should they be returned to that environment."

We find no merit in appellant's arguments "(a)" through "(e)" under his first point.

■ The first point also asserts the trial court's findings did not relate sufficient facts pertaining to termination under § 211.447.2(3), RSMo Cum.Supp.1990. Appellant cites one case, *D.E.J. v. G.H.B.,* 609 S.W.2d 472 (Mo.App.1980), in support of this contention.

*D.E.J.* does not aid appellant. There, the findings simply parroted the statute. No specific facts were found. Here, there are findings in the statutory language plus specific factual findings on sexual abuse, failure to cooperate with DFS, refusal to undergo counseling, and other subjects. The findings are sufficient.

Appellant's first point is denied.

■ Appellant's second point, the only one not yet addressed, attacks a finding by the trial court that appellant and H_____ repeatedly or continuously failed, although physically or financially able, to provide the children adequate food, clothing, shelter or education, or other care and control necessary for their physical, mental, or emotional health and development.

Appellant maintains the petition on which the instant case was tried did not allege this ground as a basis for terminating *his* parental rights. Furthermore, says appellant, there was no evidence to support the finding as to *him.*

■ We agree. However, that does not require reversal. There was clear, cogent and convincing evidence to support two statutory grounds for termination—the ones unsuccessfully challenged by appellant in points three and one. If there exists one statutory ground for termination of parental rights, that is sufficient for termination provided it is in the best interests of the child. *In Interest of J.C.G.,* 743 S.W.2d 449, 452[3] (Mo.App.1987); *In Interest of Kevin,* 685 S.W.2d 938, 941[3] (Mo.App.1985); *In Interest of H.J.P.,* 669 S.W.2d 264, 273[13] (Mo.App.1984).

In the instant case, the trial court found termination of the parental rights of appellant and H_____ to both children would be in the children's best interests. There is ample evidentiary support for that finding.

We have carefully examined the record—almost 1,000 pages of transcript, two videotapes, and several hundred pages of pleadings, records and other documents—and find no basis for reversal in any point briefed by appellant. In sum, the case ultimately hinged on issues of credibility and persuasiveness of the evidence. The trial court, exhibiting commendable patience and objectivity throughout the protracted trial, resolved those issues against appellant. We do not substitute our judgment for that of the trial court on credibility issues. *Strauss v. Strauss,* 755 S.W.2d 742, 743[1] (Mo.App.1988); *Estate of Graves,* 684 S.W.2d 925, 928[2] (Mo.App.1985).

The order terminating parental rights is affirmed.

PREWITT, P.J., and PARRISH, J., concur.