**In the Interest of J.M.T., a Minor,**

**S.L.D., Natural Mother, Appellant,**

**v.**

**Greene County Juvenile Office, Respondent.**

**No. SD 31891.**

Missouri Court of Appeals, Southern District, Division One.

Oct. 17, 2012.

---

Arthur E. Olson, Springfield, MO, for Appellant.

Bill Prince, Springfield, MO, for Respondent.

WILLIAM W. FRANCIS, JR., J.

S.L.D. ("Mother") appeals the judgment terminating her parental rights to her minor child, J.M.T. ("Child"), who was born in 1999.[1] Finding no merit in her six points on appeal, we affirm the judgment of the Juvenile Division of the Circuit Court of Greene County (the "trial court").[2]

## Factual and Procedural Background

Viewing the evidence in the light most favorable to the trial court's judgment, *In re C.A.M.*, 282 S.W.3d 398, 401 (Mo.App. S.D.2009), the record reveals Child has been in protective custody since approximately November 9, 2007. Mother voluntarily gave custody of Child to the Children's Division of the Department of Social Services ("the Children's Division") due to the fact that Child "had been hospitalized by [Mother] [for behavioral and mental health issues] a couple of times in Cox North and at Lakeland, and [Mother] was pretty much frustrated and didn't know how to handle him. So she . . . voluntarily plac[ed] him in care." Prior to this, in October 2007, the Children's Division investigated a report that Child had threatened to kill his brother by stabbing him. During that investigation, Child was hospitalized at Cox North and Mother reported behavioral problems such as aggressively

1. A.T. ("Father") was named as Child's biological father in the termination of parental rights petition filed in the trial court below and his parental rights were also terminated as part of these proceedings. As Father is not a party to this appeal, we make no decision regarding the propriety of the trial court's termination of his parental rights and refer to evidence about Father only as is necessary to address Mother's appeal.

2. This Court's use of the term "trial court" is meant to represent the proceedings conducted before Commissioner Chester B. Hayes, whose findings and recommendations were subsequently adopted by Circuit Judge David C. Jones on February 1, 2012.

chasing other children, spitting on people, hoarding dangerous items such as razor blades and knives, cursing, punching walls, choking his younger sister, throwing inanimate objects, and punching Mother in the face and stomach, as well as kicking her repeatedly.[3] Additionally, Mother indicated to the Children's Division that, prior to this hospitalization, Child had been hospitalized for behavior and mental health-related issues on at least six occasions and had been diagnosed as bipolar, as well as having obedience disorder, mild mental retardation, post-traumatic stress disorder, and attention-deficit/hyperactivity disorder.

As part of the services offered to Mother by the Children's Division, a treatment plan was implemented by the Children's Division on December 31, 2007, and it was approved by the trial court on January 2, 2008. At the time of the creation of the treatment plan, the goal for Child was reunification with Mother, and the major issues Mother needed to address were stability issues, parenting issues, and management of Child's behavioral problems.

Kary Brichacek ("Brichacek"), Child's caseworker from the time of the implementation of the treatment plan through April 2011, testified Mother's behavior and compliance with her treatment plan began to change in approximately March 2010. Prior to March 2010, Brichacek reported Mother completed a requested psychological evaluation, maintained contact with Brichacek as asked, made herself available for random drug testing, signed all requested paperwork and releases, had no known law violations, generally exercised her visitations with Child, maintained contact with Child, and provided Child with food, clothing and other in-kind gifts. Yet, Brichacek related that during this same time period, Mother failed to maintain stable housing, resided with an inappropriate paramour who had tested positive for cocaine, failed to complete parenting classes to which she was referred, failed to attain or maintain steady employment, began and then stopped attending her required individual and family therapy appointments, and failed to voluntarily provide any financial support for Child, although she received disability benefits. Brichacek reported that beginning in February 2010, Mother's contact and visitation with Child became sporadic with Mother having "ample opportunity to visit [Child]," but she began canceling visits by saying she was ill or arriving late to visits. Mother's last visitation with Child was in March 2010. Following March 2010, Mother did not maintain contact with Brichacek; failed to exercise her visitation or contact Child in any manner; failed to provide any type of support for Child, whether financial or in-kind; did not make herself available for drug testing; and did not keep the Children's Division apprised of her contact information or employment status. Brichacek related that her last contact with Mother was the receipt of a letter from her in June 2010 in which Mother stated to Child "that it wasn't his fault, and she loved him and she was pretty much done working to get him back." Brichacek reported that at the time she relinquished the case, Child was struggling with his living situation in that he would often request to continue living with his foster family, but would still mention the possibility of residing with Mother.

Amy Modglin ("Modglin"), Child's caseworker from April 2011 through the time of the trial, testified she had no contact with Mother whatsoever. She related Mother had not had visitation with Child

---

**3.** It was noted that representatives from Child's school reported they had neither witnessed nor experienced any behavioral problems from Child.

since March 2010, had provided no support of any kind since that time, had provided no evidence she had been working on her treatment plan, and had failed to take advantage of the services offered to her by the Children's Division. According to Modglin, Child reported that one of the only things he remembered about Mother was "how much [she] yelled at him."

On March 18, 2009, the "PETITION TO TERMINATE PARENTAL RIGHTS" was filed with the trial court by a Deputy Juvenile Officer ("Juvenile Officer") with the Greene County Juvenile Office. Mother was appointed counsel to represent her interests and an answer to the petition was filed on her behalf.

The trial in this matter was held on September 20, 2011, and January 13, 2012. Neither Mother, nor her appointed counsel, although notified, appeared at any time during the two-day trial. At trial, both Brichacek and Modglin recommended termination of Mother's parental rights. Further, the Juvenile Officer introduced the psychological evaluation performed upon Mother by Dr. Mark Bradford ("Dr. Bradford"). In his evaluation of Mother, Dr. Bradford observed Mother's "verbal skills and understanding seemed below average ... and intellectual testing revealed [she] was at least mildly retarded"; she was "slower than average completing testing tasks"; had "grave difficulties reading, seems to have not understood many of the forms or questions, although she filled them out"; she had poor reading comprehension; her "speech was unclear at times"; she would quit tasks when they became too difficult for her; she was "illiterate for most practical purposes, and unable to recognize many simple words" such that Dr. Bradford concluded her reading ability was at an elementary school level; she was unsure who the current President of the United States was; she was unable to do simple math such as subtracting 7 from 100; and she could not grasp simple concepts. Mother admitted to Dr. Bradford that she had a history of abusing methamphetamines, had one minor arrest several years prior, and quit her last job because she " 'just ... was ... doing meth at the time. So [she] chose to do that instead of ... be at work.' " She related she was on disability due to diagnoses of depression, anxiety and bipolar, and that she took a number of medications "for anger." She further reported a history of mental health issues, including several mental health hospitalizations and at least one suicide attempt. She reported she had been the victim of domestic abuse at the hands of Father, that she had anxiety and worry, and that she had a history of depression and mood swings. Based on the information provided by his testing and reported to him by Mother, Dr. Bradford concluded Mother "may be best described as a person with limited cognitive ability and delayed emotional development"; she presented "as an egocentric and self-centered woman, as is not uncommon with low functioning retarded individuals"; she was "somewhat primitive, blank, childlike, emotionally vacuous, interpreting events as to how they affect her, rather than having full understanding of what [Child] might be thinking or feeling"; and she has "a narrow repertoire of problem solving skills limited to her own basic functioning, and taking care of her own basic needs." Dr. Bradford concluded that due to Mother's "lack of energy, depression, lower skills, she may be somewhat functionally incapacitated in terms of providing full emotional support, adequate structure guidance, and nurturance for children due to her own intellectual and emotional limitations" such that "she will either need services and help to care for a child" or it is "possible [Child] has too many problems for her to care for at this

time." He stated that his prognosis of Mother's ability to care for Child in the future was "guarded[.]" Dr. Bradford found it "is possible that [Mother's] emotional issues, as well as [Child's] behavioral/emotional issues, might make a return home soon impossible."

Carla Hiebsch ("Hiebsch"), Child's licensed professional counselor, testified she had been seeing Child on at least a weekly basis from February 2011 until the time of trial. She reported Child suffered from some aggression issues, some attention deficit problems, and was "very oppositional, very defiant in the home." She reported he had made progress during his treatment. She related Child rarely spoke of Mother and this indicated to her the lack of an emotional bond with Mother, but that he seemed to speak of his sister often and she would not be surprised if Child had a desire to have contact with his sister. Hiebsch pointed out that there was an increased negative effect on Child based on Mother's action in voluntarily placing him in care and then continuing to parent the younger sister. She related Child was bonded with his current foster family, regarded their children as his brothers, and desired to be adopted by that family. She stated that if he were to stay in that home "he'd have the possibility to be a very successful young man."

The trial court entered its "FINDINGS OF FACT, CONCLUSIONS OF LAW, RECOMMENDATIONS AND JUDGMENT TERMINATING PARENTAL RIGHTS" on February 1, 2012. The trial court found the Juvenile Officer had proved neglect,[4] pursuant to section 211.447.5(2), as well as failure to rectify, pursuant to section 211.447.5(3).[5] Further, although not pled by the Juvenile Officer in her petition against Mother, the trial court also found Mother had abandoned Child, pursuant to section 211.447.5(1). Additionally, the trial court concluded it would be in the best interest of Child to terminate Mother's parental rights. Mother then appealed.

The issues presented for our determination are:

1. Did the trial court err in terminating Mother's parental rights on the basis of abandonment although it was not a statutory ground for termination alleged in the petition?

2. Was the trial court's termination of Mother's parental rights on the statutory ground of abandonment supported by substantial evidence?

3. Was the trial court's termination of Mother's parental rights on the statutory ground of neglect supported by substantial evidence?

4. Was the trial court's termination of Mother's parental rights on the statutory ground of abuse supported by substantial evidence?

5. Was the trial court's termination of Mother's parental rights on the statutory ground of failure to rectify supported by substantial evidence?

6. Did the trial court abuse its discretion in finding termination of Moth-

---

4. "Neglect" is defined as the "failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being." *In re J.L.B.*, 9 S.W.3d 30, 35 (Mo.App. W.D.1999) (quoting § 210.110(12), RSMo 1994). "Neglect" is described as the failure to perform the duty with which a parent is charged by law and conscience. *In re S.L.N.*, 8 S.W.3d 916, 922 n. 5 (Mo.App. S.D.2000).

5. All references to section 211.447 are to RSMo Cum.Supp. (2009), unless otherwise indicated.

er's parental rights was in the best interest of Child?

For ease of analysis, we have chosen to address Mother's points out of order and have also elected to combine several of the aforementioned points.

## Standard of Review

Termination of parental rights requires the trial court to find a statutory ground for termination and that termination is in the child's best interest. *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 815 (Mo. banc 2011). The grounds for termination at the trial court, must be shown by clear, cogent, and convincing evidence. *Id.* "'The clear, cogent, and convincing standard of proof is met when evidence instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.'" *Id.* (quoting *In re Adoption of W.B.L.*, 681 S.W.2d 452, 454 (Mo. banc 1984)) (internal quotation omitted). We review whether the evidence before the trial court met this standard under *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *Id.* We thus affirm the trial court's judgment "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *In re Adoption of C.M.B.R.*, 332 S.W.3d at 815. In our review, we bear in mind that the trial court was in a superior position to judge the credibility of the witnesses and that it was free to believe all, part, or none of the witnesses' testimony. *In re B.C.K.*, 103 S.W.3d 319, 322 (Mo.App. S.D.2003). Further, when the trial court has received conflicting or contradictory evidence, we view the facts in the light most favorable to the trial court's judgment. *In re C.A.M.*, 282 S.W.3d at 405.

## Points II, III, IV and V: Substantial Evidence to Support a Statutory Ground for Termination

To terminate parental rights, a trial court must use a two-step analysis. *In re B.H.*, 348 S.W.3d 770, 776 (Mo. banc 2011). In the first step, the court must find by clear, cogent and convincing evidence that one or more statutory grounds for termination exist. § 211.447.6; *In re P.L.O.*, 131 S.W.3d 782, 788 (Mo. banc 2004). After finding that at least one statutory ground for termination has been proven, the trial court then moves to the second step and must determine, by a preponderance of the evidence, whether the termination of parental rights is in the child's best interest. § 211.447.6; *In re P.L.O.*, 131 S.W.3d at 788–89. "The termination of parental rights is an awesome power that involves fundamental liberty interests associated with family and child rearing." *In re L.M.*, 212 S.W.3d 177, 181 (Mo.App. S.D.2007). As such, "we review the record very closely to ensure this awesome power was properly exercised." *Id.* "Statutes that provide for the termination of parental rights are strictly construed in favor of the parent and preservation of the natural parent-child relationship." *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. banc 2004).

## Analysis

We begin by noting that in order to affirm the judgment where multiple statutory grounds for termination of parental rights are found by the trial court and challenged by the appellant, the appellate court need only find that one of the statutory bases was proven and that termination was in the best interest of the child. *See In the Interest of M.J. and C.J.*, 66 S.W.3d 745, 747 (Mo.App. S.D.2001); *In re E.C.H.J.*, 160 S.W.3d 815, 819 (Mo.App. W.D.2005). As such, we need only consider one of Mother's complaints aimed at the

various statutory grounds found by the trial court, and we have chosen to examine the trial court's determination under section 211.447.5(3), which is commonly referred to as the "failure-to-rectify provision."

Parental rights may be terminated under section 211.447.5(3) if the trial court finds the child has been under the jurisdiction of the juvenile court for at least a year and the conditions that led to the assumption of jurisdiction exist or potentially harmful conditions currently exist, there is little likelihood the conditions will be remedied, or continuation of the parent-child relationship greatly diminishes the child's prospects for integration into a stable and permanent home. § 211.447.5(3). Under this statutory provision, the trial court is required to consider and make specific findings regarding:

(a) The terms of a social service plan entered into by the parent and the [Children's Division] and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the [Children's Division] or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

(c) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(d) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control over the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control[.]

§ 211.447.5(3)(a)–(d). These factors do not constitute separate grounds for termination in and of themselves, but are categories to be considered with all other relevant evidence. *In re B.L.H.*, 158 S.W.3d 269, 278 (Mo.App. E.D.2005).

In the twelve sub-points found under Point V of Mother's brief, she argues there was no evidence she neglected Child; no evidence she had "either the financial or physical ability to provide for [Child]" such that she could not be convicted of failing to support him; no evidence her "alleged abandonment ... or alleged neglect of [Child] resulted in a detrimental impact on [him]"; no evidence her "alleged abandonment" or "alleged inability/unwillingness to meet [Child's] basic needs resulted in a convincing link to a likelihood of future harm to [Child]"; there was no evidence of abuse nor was there evidence her "alleged emotional abuse resulted in a detrimental impact on [Child]" or "resulted in a convincing link to a likelihood of future harm to [Child]"; there was a "lack of evidence that the conditions that led to the assumption of jurisdiction, namely that [she] had an appropriate home and her frustration with [Child's] behaviors, indicated a risk of harm to [Child]"; she made progress on her treatment plan; there was evidence her home and care of Child "were not conditions of a potentially harmful nature"; there was a lack of evidence the Children's Division "failed to aid Mother on a continuing basis in adjusting her circumstances to provide a home for [Child]"; and there was "a lack of evidence of actual harm to [Child]." Mother's arguments fail.

Here, the trial court found all three required elements and specifically noted these conditions: "abandonment of [Child] by [Mother]; the neglect of [Child] by [Mother]; and the ongoing failure on the part of [Mother] ... to demonstrate the ability to provide [Child] with a stable

living environment and the appropriate care, custody and control." In reaching this conclusion, the trial court considered and made findings as to each of the four required factors under section 211.447.5(3). As to factor (a) the trial court found:

[Mother was] subject to the provisions of [a] court-ordered treatment plan[ ].

Subsequent to March of 2010, [Mother] provided no verification of compliance with the provisions of her treatment plan. She did not maintain contact with [Child] or her caseworker and her whereabouts and current circumstances were and have been unknown.

Prior to March of 2010[,] [Mother] did not maintain stable housing having had approximately 6 different residences. She was never able to demonstrate the ability to provide stable, appropriate housing.

Prior to March of 2010, [Mother] did not consistently provide verification of her household composition.

Prior to March of 2010[,] [Mother] completed a psychological evaluation.

Prior to March of 2010[,] [Mother] attended counseling.

Prior to March of 2010, [Mother] maintained contact with her worker and kept the agency apprised of her whereabouts and household composition.

Prior to March of 2010, [Mother] was not employed.

As to factor (b), the trial court found Mother "[was] provided with the ability to receive intensive services" and she "failed and refused to participate in those services." As to factors (c) and (d), the trial court noted there was no evidence Mother suffered from a mental condition or an untreatable chemical dependency. Based on the foregoing, the trial court concluded Mother's "acts had a negative impact on [Child] in that [Child] was abandoned and neglected by [Mother]"; Mother "failed to

demonstrate the ability to meet the basic needs of [Child]"; and there is "significant likelihood of future harm to [Child] if parental rights are not terminated because [Mother] has abandoned [Child,] [and] has continued to demonstrate the inability/unwillingness to meet [Child's] basic needs." After careful review of the record, we find each of the trial court's findings on factors (a)–(d) are supported by the documentary and testimonial evidence presented at trial.

 As it relates to Mother's non-compliance with her treatment plan, it has long been held that compliance and non-compliance with such treatment plans provide highly relevant evidence to the trial court. *In re S.M.H.*, 160 S.W.3d 355, 368 (Mo. banc 2005). The extent to which a parent has made an effort to accomplish the plan's goals indicates the parent's future efforts to care for the child. *Id.* Conversely, a parent's lack of effort to comply with the plan, or effort without success, can help predict future problems. *Id.* While a parent is not required to satisfy every single provision of the plan and failure to comply with one or more parts of the plan does not constitute automatic grounds for termination of parental rights, the issue is whether progress has been made toward the plan goals, not whether there has been full or substantial compliance. *Id.* at 368–69.

 While Mother made some effort to comply with her treatment plan from the time Child was taken into custody until approximately March 2010, Mother had no further contact with Child or the Children's Division from that time through the present with the exception of the letter she sent to Brichacek in June 2010 advising her that "she loved [Child]" but "was pretty much done working to get him back." Based on the record, Mother failed to continue with the counseling sessions to aid in

her parenting and life skills required by her treatment plan; failed to maintain stable housing and was continually living with family, friends, and her paramour, who was found not to be a suitable caretaker for Child, despite the requirements of her treatment plan; and she failed to maintain contact with the Children's Division and keep them apprised of her whereabouts, employment, and living situations as required by her treatment plan. Further, although Mother contends there was no evidence she had "either the financial or physical ability to provide for [Child]," this does not ameliorate the fact that her treatment plan specifically provided that she agreed "to support [Child] while he is in protective custody by means of clothing, toys, hygiene supplies, and other needed items such as shoes." While she may have provided some in-kind gifts to Child prior to March 2010, the trial court could have reasonably discounted these prior gestures—especially in light of the fact that at the time of trial, Mother had failed to contact or request to visit Child in excess of one year. "[M]ere participation in a treatment plan is not sufficient to bar termination." *In the Interest of S.A.J. and S.L.J.*, 818 S.W.2d 690, 702 (Mo.App. S.D. 1991). "A parent must make a commitment to change the course of conduct which necessitated removal of the child[ ]." *Id.*

Additionally, although the trial court found no mental condition which in itself would prevent Mother from parenting Child, Dr. Bradford, in detailing Mother's cognitive issues and mental health concerns, recommended Mother have "ongoing counseling and parenting training . . . to see how much she might be able to assimilate" and that with support she "might be able to assimilate budgeting/parenting/emotional information such that a return home [for Child] might be possible in the future." Based on her

insistence to him that she was "willing to do whatever [the Children's Division] wants[,]" Dr. Bradford further suggested "ongoing general housing assistance and additional monitoring and aid." Despite the terms of her treatment plan that provided she agreed to "follow all recommendations" of her psychological evaluator, there was no evidence Mother availed herself of any of the services and counseling recommended by Dr. Bradford and, in fact, there was evidence that she stopped going to therapy altogether.

Further, there was evidence that intensive services and other aid were offered to Mother by the Children's Division, but she was "unwilling[ ] to participate" and she declined to take advantage of those services. Likewise, Mother did not take full advantage of the services which she agreed to participate in such as the parenting classes and counseling sessions.

 It is clear that

[a]n essential part of any determination whether to terminate parental rights is whether, considered at the time of the termination and looking to the future, the child would be harmed by a continued relationship with the parent. A prospective analysis is required to determine whether grounds exist and what is in the best interests of the child for the reasonably foreseeable future. Obviously, it is difficult to predict the future.

*In re K.A.W.*, 133 S.W.3d at 9. Our courts look to the totality of a parent's conduct, both prior to and after the filing of the petition, and " '[a]ll grounds for termination must to some extent look to past conduct because the past provides vital clues to present and future conduct.' " *In re N.M.J.*, 24 S.W.3d 771, 780 (Mo.App. W.D.2000) (quoting *In re T.T.*, 954 S.W.2d 429, 432 (Mo.App. W.D.1997)). Mother's failure to comply or make progress on her

treatment plan, the fact that she essentially abandoned Child from approximately March 2010 to the present time, and her failures to substantially take any steps toward reunification with Child, support the trial court's determination in this matter. There was substantial evidence presented that the conditions which led Child to be placed in custody continued to exist and that conditions of a potentially harmful nature continued to exist that prevented Child from being returned to Mother. The trial court did not err in terminating Mother's parental rights on failure-to-rectify grounds. Point V lacks merit.[6]

Based on this determination as it relates to Point V, we need not substantively examine Mother's Points II, III, and IV, which also challenge the trial court's stated statutory grounds for termination. *M.J. and C.J.*, 66 S.W.3d at 747; *E.C.H.J.*, 160 S.W.3d at 819. Accordingly, Mother's Points II, III and IV are moot and therefore denied.

### Point I: Abandonment Not Pled in Petition

Mother argues under this point relied on that because the statutory ground of abandonment was not pled in the petition, she did not receive notice that it would be an issue at trial. While this argument seems facially unreasonable in that Mother failed to appear at trial or attempt to engage in this process whatsoever, we need not address it on its merits. Having already determined above that when multiple statutory grounds for termination are stated in the trial court's judgment we are re-

quired only to find that one ground was properly pleaded and proven, *M.J. and C.J.*, 66 S.W.3d at 747, we need not consider this point as we have already found there was substantial evidence that the trial court's termination of Mother's parental rights was proper under section 211.447.5(3).

### Point VI: Best Interest of Child

"After a sufficient showing of a ground for termination, the trial court is then required to determine whether or not termination of parental rights is in the best interest of the child." *In re B.H.*, 348 S.W.3d 770, 774 (Mo. banc 2011). A trial court's best-interest determination must be based on a preponderance of the evidence. *In the Interest of D.M.B.*, 178 S.W.3d 683, 689 (Mo.App. S.D.2005). "We review this finding under an abuse of discretion standard." *Id.* at 689–90. The trial court's discretion is abused " 'when it is so clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.' " *Id.* at 690 (quoting *In re E.D.M.*, 126 S.W.3d 488, 497 (Mo. App. W.D.2004)).

### Analysis

 Determining a child's best interest is a subjective assessment based on the totality of the circumstances. *In re C.A.M.*, 282 S.W.3d at 409. Section 211.447.7 provides the trial court with seven factors to consider when determining whether termination of the parent-child

---

**6.** Mother also contends under this point relied on that there was no evidence or indication that her acts or conditions provided a likelihood of future harm to Child, that conditions of a potentially harmful nature continued to exist, or that the conditions that led to the assumption of jurisdiction continued to exist. We need not explore these contentions fully in that there is overwhelming evidence Mother continues to struggle with the same issues that led to Child being taken into protective custody, as well as new issues. There was no evidence Mother was in any better position financially, personally, or mentally than she was four years prior when Child was placed into custody.

relationship is in the best interest of a child.[7] "There is no requirement, statutory or otherwise, that all seven of these factors must be negated before termination can take place; likewise, there is no minimum number of negative factors necessary for termination." *Id.*

Again asserting twelve sub-points, Mother urges there was no evidence she neglected Child; no proof she was able to support Child such that her non-support should not be held against her; no evidence her "alleged abandonment" or "alleged neglect" had any detrimental impact on Child; no evidence her "alleged abandonment" or "alleged inability/unwillingness" to meet Child's basic needs showed a likelihood of future harm; no evidence she abused Child, nor was there evidence any potential abuse had a detrimental impact on Child; there was a lack of evidence that the conditions that led to the assumption of jurisdiction indicated a risk of harm to Child; there was evidence she made progress on her treatment plan; there was evidence her care was not potentially harmful to Child; "[t]here was a lack of evidence that the Children's Division failed to aid [Mother] on a continuing basis in adjusting her circumstances to provide a home for [Child]"; there was a lack of evidence of actual harm to Child; there was evidence of emotional ties between Mother and Child; and the bond between

Child and his foster family should have been "given little weight considering the totality of the circumstances."

Here, in considering the seven factors set out in 211.447.7, the trial court found there was "[n]o evidence ... presented that [Child] had healthy ties to [Mother]"; Mother did not maintain "regular visitation or contact with [Child]"; Mother did not provide "financial or in-kind support for [Child]"; Mother "abandoned [Child] and has not made an effort to parent [Child]"; that the "continuation of the parent-child relationship greatly diminishes [Child's] prospects for early integration into a stable and permanent home"; and Mother's "inability ... to provide proper care, custody and control for [Child] is potentially harmful to [Child] should [Child] be returned to that environment." We agree with the conclusions of the trial court.

 The record reveals Child's therapist, Hiebsch, believed there was not a strong bond between Child and Mother based on the fact that Child rarely spoke of Mother, and there was ample evidence Mother had not seen Child since March 2010. It is axiomatic that "'a lack of bonding is substantial evidence supporting that termination is in the best interest of the child[.]'" *In re Z.L.R.*, 347 S.W.3d 601, 611 (Mo.App. S.D.2011) (quoting *In re*

---

7. Those factors are:
 (1) The emotional ties to the birth parent;
 (2) The extent to which the parent has maintained regular visitation or other contact with the child;
 (3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the [Children's Division] ...;
 (4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;
 (5) The parent's disinterest in or lack of commitment to the child;
 (6) The conviction of the parent of a felony offense that the court finds is of such a nature that the child will be deprived of a stable home for a period of years; provided, however, that incarceration in and of itself shall not be grounds for termination of parental rights;
 (7) Deliberate acts of the parent or acts of another of which the parent knew or should have known that subjects the child to a substantial risk of physical or mental harm.
 § 211.447.7(1)–(7).

*C.A.M.*, 282 S.W.3d at 408). Further, despite Mother's protestations, there was testimony she had never provided financial support for Child and had in years prior only, occasionally provided Child with in-kind gifts. "Section 211.447.8 makes clear it is in the discretion of the juvenile division to attach little or no weight to such token gestures of support." *C.V.E. v. Greene County Juvenile Office*, 330 S.W.3d 560, 573 (Mo.App. S.D.2010). Mother's lack of interest and commitment to Child is evidenced by her lack of compliance with the treatment plan, her failure to contact or visit Child for a period of years, her lack of follow-through with therapy and other aid offered to her, and her lack of making any type of commitment to change. It is further not lost on this Court that although Mother protests the use of the term "abandonment," there is no denying the fact that she voluntarily relinquished custody of Child to the Children's Division and then years later cut off all ties with Child via a letter sent to his caseworker. Additionally, despite Mother's assertions that she made "progress" on her treatment plan, our discussion above—in consideration of Point V—makes it clear she did not. Lastly, we are always mindful that it "is the trial court's duty to weigh the evidence presented relating to best interest and we will not reweigh that evidence." *In re B.S.W.*, 108 S.W.3d 36, 44 (Mo.App. S.D.2003).

The trial court herein was charged with assessing "the totality of [Mother's] conduct" in making its best-interest determination and, after reviewing the evidence, we agree Mother failed to show a commitment to Child, a dedication to working toward reunification, or a desire to remedy the concerns of the Children's Division. There were sufficient findings to support the best-interest determination made by the trial court. There was no abuse of discretion in the trial court's decision that

it was in Child's best interest to terminate Mother's parental rights. Point VI is denied.

The trial court's Findings of Fact, Conclusions of Law, and Judgment are affirmed.

GARY W. LYNCH, P.J., and NANCY STEFFEN RAHMEYER, J., concur.