

# Missouri Court of Appeals

## Southern District

### Division Two

IN THE INTEREST OF C.E.A., MINOR,    )
        )
GREENE COUNTY JUVENILE OFFICE,    )
        )
    Respondent,    )
        )
vs.    )    No. SD37317
        )
E.A.F.,    )    **Filed: May 27, 2022**
        )
    Appellant.    )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

### Honorable Calvin R. Holden, Judge

### <u>AFFIRMED</u>

E.A.F. ("Mother") appeals the judgment terminating her parental rights to her child, C.E.A. ("Child"), on the grounds of neglect, section 211.447.5(2), failure to rectify, section 211.447.5(3), and parental unfitness, section 211.447.5(5).[1]  Mother raises four points on appeal.  In point 1, Mother claims she "was not afforded effective assistance of counsel because [she] was deprived of a meaningful hearing" since the parties and witnesses appeared virtually for portions of the trial.  In point 2, Mother claims the trial court erred in terminating Mother's parental rights on the statutory grounds of neglect and failure to rectify by misapplying the law.  In point 3, Mother argues the trial court erred in terminating her parental rights on the statutory

---

[1] The parental rights of Child's father were also terminated, but he is not a party to this appeal.  All statutory citations are to RSMo Cum. Supp. (2018).  All rule references are to Missouri Court Rules (2021).

ground of failure to rectify by "relying upon grounds that existed when the trial court first assumed jurisdiction." In point 4, Mother argues the trial court erred in "failing to make a record of the proceedings . . . by failing to require certification of connection status of participants." Finding no merit in Mother's points, we affirm.

The trial for this case took place during the COVID-19 pandemic over several days in September 2020 and March 2021. For portions of the trial, the parties and witnesses appeared virtually. The evidence, viewed in the light most favorable to the judgment, is as follows. *See In Interest of T.T.G. v. K.S.G.*, 530 S.W.3d 489, 491 (Mo. banc 2017).

## Evidence of Past Abuse and Neglect

Child was born in September 2013. In May 2016, when Child was two and a half years old, Child came under the care and custody of the Children's Division ("the Division") after a Division investigator visiting Mother's home became concerned about drug paraphernalia in the home, domestic violence in the home, Mother's struggles with drug addiction, and Child's extreme and aggressive behavior.

Prior to May 2016, Child had an unstable lifestyle. Mother and father abused drugs and engaged in domestic violence in front of Child. Mother was not attentive to Child and was "never really a parent to him." In a July 2016 interview with Jo Lowery ("Lowery"), a case worker for the Division, Mother admitted Child witnessed frequent physical aggression between Mother and father. Lowery testified Mother was "farming [Child] out to other relatives and [had] signed powers of attorney" when Child was in Mother's care. Child believed he had been physically abused by Mother and told a parent aide that Mother would "smack [him] in the face" and yell at him. Child also described father as a man who was very scary.

## Evidence of Trauma and Special Needs Caused by Prior Abuse and Neglect

Child was traumatized by the domestic violence he witnessed in the home. When he first came into care, he was covered in scabies. Child "was feral" and exhibited extreme behavioral issues, so extreme that Isabel's House, a crisis nursery, refused to provide housing for Child

2

because of his aggressive and wild behavior. Relatives and friends also refused to serve as a placement option due to his aggression. While living in his first foster home, Child was nonverbal—he would grunt, scream, and yell. He would also hit, choke, and bite people. When angry, he would engage in self-harm, by squeezing his penis until it turned black and blue, biting his lip until it bled, and scratching himself.

Due to Child's extreme behavior, it was almost impossible to find anyone to take him. Child was placed "in an elevated needs foster home[.]" When asked if an elevated needs placement for Child was appropriate, Lowery responded, "Oh, my. Yes." According to Lowery, Child's behaviors were the most bizarre behaviors she had ever seen.

After turning three, Child had a psychiatric evaluation with Dr. Kyle John ("Dr. John"). Child's behaviors were so extreme that Dr. John prescribed Child a mood stabilizer with an antipsychotic component, which is only prescribed in severe cases, and rarely for children of Child's age.

Child's behavior became too much for his first foster parents, and Child was eventually placed with a more experienced foster parent for children with elevated needs. While in this foster parent's care, Child would smear feces all over the place, urinate anywhere on purpose, and once pulled a television down from a shelf. However, with intensive services and dedicated care, Child's behavior eventually began to improve.

### Evidence of Improved Behavior—Attachment to Current Foster Family, The Boones

In November 2016, Child met another foster child at church and the two children developed a strong bond. Child began frequently visiting the boy's home—the Boone family's home—for playdates and activities. Initially, Child's behavior during these playdates was out of control—he would urinate on carpets, throw things, and try to choke Mrs. Boone who was supervising the playdates. Despite these challenges, the Boones attended a training for

3

elevated-needs children and in May 2017, Child moved in with the Boone family as a transition to a possible permanent home.

At the time of trial, Child had spent about four years with the Boone family and had lived with them for over three years. Child's behavior dramatically improved while in the Boone home. At the time of trial, Child considered the Boones his family and was adamant he wanted to be adopted by them.

## Evidence of Mother's Impact on Child

Lowery supervised visits between Mother and Child in July 2016. After these visits, Child was out of control, would not sleep, had night terrors, and engaged in more self-harming behaviors. A therapist, Casey Rogers, who worked with Child at that time, recommended Mother's visits be suspended. These visits were eventually suspended due to the negative effects the visits had on Child and because of Mother's non-compliance with Family Treatment Court.

From July 19, 2017 to January 3, 2018, Raquel Morrow ("Morrow"), a licensed professional counselor, provided counseling services to Child. Attorneys for Mother and father asked Morrow to show Child photographs of his biological parents. Child, after viewing the photographs, "became somber, withdrawn and less talkative." In one session, he told Morrow, "I don't want to see them." Morrow also recommended Child not have visits with Mother. Morrow discontinued therapy because she believed Child linked her appearance with Mother and father, and as a result, the therapeutic relationship could not be salvaged. Morrow believed showing Child photographs of his biological parents had a negative impact on him. Morrow opined that if Child had Post-Traumatic Stress Disorder ("PTSD"), she would have concerns about forcing him to return to a home he associated with trauma because it would be harmful for his emotional welfare and development.

Judy Doran ("Doran"), a licensed professional counselor, worked with Child in therapy from February 2018 until the last week of March 2020. In July 2018, Mother resumed visits with Child supervised by Doran. When the first therapeutic visit occurred, Mother had not seen

4

Child in two years. At the first visit, Child recognized his grandmother but did not recognize Mother. Mother was a stranger to him. Early in the visits, Mother told Child he was coming to live with her. This confused Child because he was being reintroduced to Mother and believed he already had a mother—his foster mother, Mrs. Boone.

During these visits, Doran attempted to model parenting behavior for Mother. While Mother could follow the modeling, she would revert back to being a friend more than a mother. She kept bringing toys and gifts to Child during these visits even after Doran asked her not to. During visits with Mother, Child's play became aggressive. Doran testified that this aggression was caused by being reintroduced to Mother. Doran testified Child is not confused about where he wants to be—with his foster family, the Boones. She believed Child was bonded to the Boone family. Doran opined she had never dealt with a child who had been in care for four and a half years. According to Doran, moving Child from the Boone family would be "detrimental and catastrophic" for Child's behavior. Doran also testified Child has Reactive Attachment Disorder ("RAD") but is learning how to manage it. However, because the Boones have provided Child with a loving, caring family who has been consistent in their discipline, Child does not have full RAD. According to Doran, Child and his foster mother, Mrs. Boone, had a wonderful relationship and Mrs. Boone's interactions with Child were very loving and kind.

In November 2018, Alyssa Ingle ("Ingle"), a licensed counselor, began working with Child and Mother for family therapy. Ingle testified that Child talked about the Boone family a lot and he was strong enough to tell Mother he wanted to be adopted. Child referred to the Boones as "mom" and "dad[.]" When Child told Mother he wanted to stay with the Boones, Mother was tearful. The subject of adoption came up for the first time around Christmas 2018 and Child said he did not want to do visits with Mother anymore. Child was consistent regarding his wishes. Ingle testified the bond between Mother and Child was that of friendship or like a distant relative. At their final session, Ingle told Mother that regaining a parental attachment with Child was not likely to happen because Child came into care when he was a

5

two-year-old, missed important milestones with Mother, experienced severe trauma, and formed a secure bond with the Boone family. Ingle opined that removing Child from the Boone family could "cause lifetime problems" for Child.

Erica Boan ("Boan"), a licensed counselor, worked with Child in July 2020. Boan testified Child was very connected to Mrs. Boone, called Mother by her first name, and did not mention Mother in counseling unless prompted. Child had anxiety around visits with Mother and was reluctant to stay overnight with her. In Boan's report dated August 2020, Child told her he did not want any more visits with Mother. Child repeatedly said he wanted to be adopted by the Boones. According to Boan, removing Child from the Boones would cause long-term issues for him resulting in permanent damage.

Three years after Child came into care, Dr. Amy Meriweather ("Dr. Meriweather"), a licensed clinical psychologist, conducted a psychological evaluation of Child. During the evaluation, Child identified the Boones as his family and called his foster parents "mom" and "dad[.]" Dr. Meriweather observed Child interact with Mrs. Boone and the relationship was very respectful and loving. Dr. Meriweather testified that Child was bonded to the Boones and not to Mother. Child was confused as to what Mother's role in his life was, and as of the date of the evaluation, the process of mending the relationship between Child and Mother had not progressed very far.

Dr. Meriweather diagnosed Child with PTSD and Child Neglect. She suspected he had suffered physical abuse as well. Dr. Meriweather opined that Child had been affected by parental distress from his biological parents. According to Dr. Meriweather, Child's behavior was typical of a child with insecure attachment, which typically happens when a child has suffered from severe neglect. According to Dr. Meriweather, if Child had been emotionally or psychologically abused by Mother and Child was returned to her, it could trigger symptoms of Child's PTSD and even if Mother had "gotten [her] life together[,]" it would not cure Child's PTSD.

6

Kara Jennings ("Jennings") was Child's kindergarten teacher. According to Jennings, Child referred to the Boones as his family. On days Child had visits scheduled with Mother, Jennings observed Child act out inappropriately. Child told Jennings he did not want to go to the visits, that he was kind of scared of Mother, and that he was really scared that he was going to have to leave the Boones. Jennings reported Child "absolutely despises" visits with Mother and was stressed, anxious, and sad on days of the visits.

Jessie Sanders ("Sanders"), a parent aide, supervised visits with Mother and Child from April or May 2019 to August 2019 at Mother's home once a week. On the way to these visits, Child would cry because he did not want to go. A few times, he told Sanders that before he came into care, Mother "would smack him in the face and that she was just not very attentive to him, like that [Mother] was never really a parent to him."

During these visits, Mother gave Child gifts but did not allow him to take the new toys back with him. Despite being given gifts, Child told Mother he did not want to visit her and he wanted to be adopted by the Boones. Mother would become upset, cry and say bad things about the Boones in front of Child. Even after Mother was instructed not to disparage the Boones in front of Child, Mother continued to do so.

**Evidence of Mother's Mental Condition and Ability to Parent Child**

In October 2018, Dr. Mark Bradford ("Dr. Bradford"), a licensed clinical psychologist, conducted a psychological assessment on Mother. He diagnosed Mother with Substance Abuse/Dependence (by history), PTSD, Bipolar Disorder Unspecified, and Mixed Personality with antisocial and borderline personality disorder traits. Dr. Bradford wanted Mother to get off of Suboxone, because "in some cases it's become another addiction for some people" and could affect someone's ability to safely parent. Dr. Bradford opined that given Mother's personality, she would have a difficult time getting off of Suboxone. At the time of trial, Mother was taking 8 milligrams of Suboxone three times per day. "That's 24 milligrams of Suboxone. That's a big, high dose."

7

Dr. Bradford testified Mother "has a lot of baggage from the previous drug use and impulsivity and being lost and addicted." Mother admitted she had procrastinated in making the changes she needed to make to become a good parent. Mother did not advise Dr. Bradford that Child had severe behavioral problems, and Dr. Bradford did not know why Child did not want to be reunited with Mother. Mother told Dr. Bradford her visits with Child were not harmful to Child and that Child did not regress after visits. Dr. Bradford testified that sometimes a parent has done everything that she can do to try to be a better parent, but because of the needs of the child, that relationship cannot be fixed. Dr. Bradford further testified it was entirely possible that Child had "moved on in a way and emotionally [Child] may require a different homelife since [Child] has unique emotional and behavioral needs."

Robin Pummill ("Pummill"), a licensed professional counselor, had 78 therapy sessions with Mother from May 2017 until trial. Pummill said Mother was aware Child did not want to live with her and wanted to stay with the Boones. Mother told Pummill her relationship with Child's foster mom was frustrating and stressful. Pummill testified Mother "didn't parent [Child] well. She wasn't there for him." Pummill was aware Child had been diagnosed with PTSD and that it was caused by trauma Child suffered in the home of his biological parents. Pummill opined placing Child back in home of Mother could trigger additional PTSD symptoms and cause regression in Child's negative behavior. According to Pummill, it took six to seven months in counseling before Mother acknowledged any responsibility for Child being in care.

Emory Blackwell ("Blackwell"), a caseworker for Child from September 2019 to June 2020, testified Mother held at least four different jobs while he was her caseworker. Blackwell testified the relationship between Mother and Child was not a "normal family" relationship. Blackwell told Child that even if he saw Mother, he could still be adopted, which relieved Child's concerns and fears.

Corina Ayala ("Ayala") was the current caseworker beginning June 25, 2020 until trial. The first time Ayala met Child, he told her he wanted to be adopted. According to Ayala, she had

never had a seven-year-old on her case load who had remained in care for over four and a half years. Ayala testified that even after visitation was increased to overnight visits with Mother, Child still referred to Mother by her first name and called Mrs. Boone, mom.[2] Ayala, who had only handled the case for approximately three months immediately preceding the hearing, was not sure "how long it [would take] [Child] to warm up to [Mother]."

Child's guardian *ad litem* recommended it was in Child's best interest for the trial court to terminate Mother's parental rights over now seven-and-a-half-year-old Child.

## The Judgment

The trial court found that the following statutory grounds for terminating Mother's parental rights exist:

b. The minor child was abused and neglected by [Mother] and father;

c. [Mother] and father failed to rectify the conditions that led to Child coming into care or address the current concerns of a potentially dangerous nature; and

d. [Mother] and father are unfit to be a party to the parent child relationship.

In addition, the trial court found that termination of Mother's parental rights over Child was in Child's best interest. Mother appeals from that judgment in four points. For ease of analysis, we address Mother's points out of order.

## Standard of Review

The trial court's judgment is presumed valid and it is the appellant's burden to demonstrate error. ***Interest of N.D.B.***, 623 S.W.3d 223, 228 (Mo. App. S.D. 2021). An order terminating parental rights will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. ***In re Q.A.H.***, 426 S.W.3d 7, 12 (Mo. banc 2014). We view the evidence and reasonable inferences therefrom in the light most favorable to the trial court's judgment. ***J.A.R. v.***

---

[2] One parent aide provided reports that were diametrically opposite of the reports provided by the previous two parent aides. However, we note that this parent aide testified she had a personal relationship with Mother's attorney and had been on vacation with her, and enjoyed socializing with her.

9

***D.G.R.***, 426 S.W.3d 624, 626 (Mo. banc. 2014). We defer to the trial court's determinations of credibility. ***In re K.A.W.***, 133 S.W.3d 1, 11-12 (Mo. banc 2004). The trial court, in reviewing questions of fact, is free to disbelieve any, all, or none of the evidence. ***In Interest of J.P.B.***, 509 S.W.3d 84, 90 (Mo. banc 2017).

## Termination of Parental Rights

Section 211.447 is the statutory mechanism for terminating parental rights. ***In re A.S.W.***, 137 S.W.3d 448, 452 (Mo. banc 2004). In order to terminate parental rights, the trial court must engage in a two-step analysis. ***In re J.M.T.***, 386 S.W.3d 152, 158 (Mo. App. S.D. 2012). First, it must find by clear, cogent and convincing evidence that one or more statutory bases for termination exists. ***Id.*** If at least one statutory ground for termination exists, the trial court then moves to the second step, which is determining whether a preponderance of the evidence shows a termination of parental rights is in the child's best interest. ***Id.*** Mother does not challenge the trial court's determination that termination of her parental rights was in Child's best interest. Instead, she challenges the trial court's determination on the first step, the statutory basis for termination of parental rights.

### Points 2 and 3: Statutory Basis for Termination

Mother's points 2 and 3 argue the trial court misapplied the law in determining that the statutory grounds for termination exist under sections 211.447.5(2) (the "abuse or neglect" ground) and 211.447.5(3) (the "failure to rectify" ground). In points 2 and 3, Mother argues:

> ***II. The trial court erred in terminating the parental rights of Mother because the trial court erroneously declared or applied Sections 211.447.5(2)(b) and 211.447.5(3)(d), RSMo. (2018) by injecting the conditional "would."***[3]

[3] Mother's point is multifarious since it combines two claims of legal error within a single point—the trial court's alleged misapplication or erroneous declaration of sections 211.447.5(2)(b) and 211.447.5(3)(d). "When . . . appellants collapse disparate contentions of error into a single point relied on, they violate Rule 84.04(d)." ***Marck Indus., Inc. v. Lowe***, 587 S.W.3d 737, 744 (Mo. App. S.D. 2019) (quoting ***Cooper v. Bluff City Mobile Home Sales, Inc.***, 78 S.W.3d 157, 167 (Mo. App. S.D. 2002). Such points are multifarious and preserve nothing for appellate review. ***Id.*** However, since we are able to discern the nature of her claims, her violation of Rule 84.04(d) does not impede our review and we gratuitously review it.

***III. The trial court erred in terminating the parental rights of Mother because the trial court misapplied Section 211.447.5(3), RSMo. (2018) by relying upon grounds that existed when the trial court first assumed jurisdiction.***

Mother does not challenge the trial court's determination that she was unfit (*see* section 211.447.5(5)).

> When the trial court finds multiple statutory grounds for termination of parental rights, in order to affirm the judgment this Court need only find that one of the statutory bases was proven and that the termination was in the best interests of the child. *In re T.F.S.,* 52 S.W.3d 44, 48 (Mo. App. S.D.2001); *see also In re J.L.M.,* 64 S.W.3d 923, 925 (Mo. App. S.D.2002) ("[o]ne ground for termination adequately pleaded and proven is sufficient to support termination."). Thus, if an appellant fails to challenge each of the termination grounds found by the trial court, it is unnecessary for the appellate court to address the specific ground that is challenged. *In re B.J.K.,* 197 S.W.3d 237, 246 (Mo. App. W.D.2006).

*In re T.R.W.*, 317 S.W.3d 167, 170 (Mo. App. S.D. 2010) (quoting *In re J.B.*, 214 S.W.3d 353, 355 (Mo. App. S.D.2007)). Because Mother fails to challenge each statutory basis for termination, it is unnecessary for us to address the specific ground that is challenged. "However, because the termination of parental rights is one of the most serious acts a court is empowered to perform," we *ex gratia* review Mother's point 2 on the statutory grounds of abuse or neglect, section 211.447.5(2). *See **id.*** at 170 (quoting ***J.B.***, 214 S.W.3d at 355).

Under section 211.447.5(2), a trial court may terminate parental rights based on a determination that the parent abused or neglected the child. In determining if this ground for termination exists, the trial court is required to consider and make findings on four factors:

> (a) A mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;
>
> (b) Chemical dependency which prevents the parent from consistently providing the necessary care, custody and control of the child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control;
>
> (c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that indicate that the parent knew or should have

known that such acts were being committed toward the child or any child in the family; or

(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development.

§ 211.447.5(2).

Mother's point 2 challenges the trial court's determination on just one of these factors, the "chemical dependency" factor, found in subsection (b). According to Mother, the trial court misapplied the law by injecting the word "would" into its finding on this factor because, by using the word "would[,]" the trial court speculated on Mother's future condition or ability to parent rather than her present condition and ability to parent. On this factor, the trial court found:

> Whether or not a parent suffers from a chemical dependency which *would* prevent the parent from consistently providing the necessary care, custody, and control of the minor child and which cannot be treated so as to enable the parent to consistently provide such care, custody and control . . . The evidence at trial was that [Mother] has abstained from illegal drugs for several years. However, she continues to take Suboxone to help her stay clean from illegal substances. While [Mother's] use of Suboxone does not prevent her from being able to care for [Child], it is concerning that she continues to rely on it to stay 'sober' and that from the hearing date in September to the hearing in March there was no evidence that [Mother's] use of Suboxone had decreased at all.

(Emphasis added). Although the trial court used the words "would prevent" instead of ""which prevents" in its description of this factor, Mother must demonstrate "that error was committed by the trial court against the appellant materially affecting the merits of the action." Rule 84.13(b); **Adoption of K.M.W.**, 516 S.W.3d 375, 380 (Mo. App. S.D. 2017). Thus, to make this showing, Mother must demonstrate that the challenged trial court ruling (i.e., terminating parental rights on the statutory ground of abuse or neglect) was legally erroneous and that she was *actually* prejudiced as a result of that erroneous ruling or action. *See* **Interest of J.G.H. v. Greene Cnty. Juv. Office**, 576 S.W.3d 257, 260 (Mo. App. S.D. 2019).

Mother's argument fails for two reasons. First, while the statute requires a finding on whether a parent has a chemical dependency that "*prevents* the parent from consistently

providing the necessary care, custody and control of the child[,]" the trial court's finding on this factor was a finding on Mother's current condition and ability (and was in Mother's favor). Section 211.447.5(2)(b) (emphasis added). The trial court found that "[M]other's use of Suboxone *does not prevent* her from being able to care for [Child]" even though her use of the substance was "concerning." (Emphasis added). Because the trial court's finding on this factor was predicated on Mother's *current* condition and ability to parent, Mother has failed to persuasively show how the trial court's determination was legally erroneous, let alone how she was prejudiced since the finding was that her substance use does not prevent her from being able to care for Child.

Mother's argument fails for a second reason. Mother does not challenge the trial court's statutorily-required findings on the other factors under Section 211.447.5(2). These factors are not separate grounds for termination but categories of evidence that the trial court must consider along with all other relevant evidence in determining whether grounds for termination on the basis of abuse or neglect exist. ***In Interest of K.M.A.-B.***, 493 S.W.3d 457, 474 (Mo. App. E.D. 2016). There is no requirement that the trial court give these factors equal weight. Nor is there any requirement that all or most factors tilt toward termination in order for the trial court to find a statutory basis for terminating parental rights. While the trial court must make findings on all factors, proof of just one factor is sufficient to support termination of parental rights. ***Interest of S.R.H.***, 589 S.W.3d 62, 69 (Mo. App. E.D. 2019). Here, the trial court found two factors weighed in favor of terminating Mother's parental rights:

> iii.    Whether or not there was a severe act or recurrent acts of physical, emotional or sexual abuse toward [Child] or any child in the family by the parent, including an act of incest, or by another person under circumstances that would indicate that the parent knew or should have known that such acts were being committed: Evidence was presented that the father was physically abusive to [Mother] and [Child] and that [Mother] was aware of the abuse and did not do anything to remove [Child] from the dangerous situation. [Child] was diagnosed with PTSD by Dr. Amy Meriweather in May 2019, she stated that "the trauma that [Child] suffered from being with [Mother] and father has influenced his life and will continue to influence how his body reacts to stress." Due to this previous trauma when [Child] was so young, Dr.

Meriweather goes on to say that [Child] will likely have past trauma resurface throughout different phases of his life and not know why.

iv.  Whether or not there was a repeated or continuous failure by the parent, although physically or financially able, to provide [Child] with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for [Child's] physical, mental, or emotional health and development. . . .

[Mother] has neglected [Child] for much of his life, at first by not meeting his needs and allowing him to be abused resulting in his being removed from her care.  Then [Mother] continued to neglect [Child] by not attending visits, by not providing support, by not having any involvement in treating his behavioral needs.  Eventually she got her life back on track and has been able to visit [Child] and provide support for him, but she has continued to neglect to listen to his wishes and his deep affection he has for his foster placement, which he views as his family.  By constantly asking [Child] to affirm that he cares about her and by not acknowledging the desire he has to stay where he feels safe and loved she is neglecting his emotional and mental health needs.

Mother's failure to address these factors is fatal to her argument because proof of just one factor is sufficient to support termination on the statutory ground of abuse or neglect. *Interest of J.L.D.*, 560 S.W.3d 906, 912 (Mo. App. E.D. 2018).  "An argument must explain why, in the context of the case, the law supports the claim of reversible error." *Washington v. Zinn*, 286 S.W.3d 828, 831 (Mo. App. E.D. 2009).  Absent an explanation of why the trial court's findings on these factors were insufficient or erroneous, Mother cannot demonstrate how the trial court's finding on the "chemical dependency" factor materially affected the merits of the action.  Nor may we craft an argument for Mother by supplementing her brief with our own research. *Burgan v. Newman*, 618 S.W.3d 712, 716 (Mo. App. E.D. 2021).  To do so would thrust this Court into the role of advocate for Mother. *Porter v. Santander Consumer USA, Inc.*, 590 S.W.3d 356, 358 (Mo. App. E.D. 2019).  "[T]he function of an appellate court is not to serve as an advocate for the parties on appeal, and this Court must carefully safeguard its role as a neutral adjudicator." *Hamilton v. Archer*, 545 S.W.3d 377, 381 (Mo. App. E.D. 2018).  Because Mother presents no argument demonstrating reversible error, Mother's point 2 fails.  Since at least one statutory ground for termination exists, we do not address point 3.

## Point 1:  Ineffective Counsel

In point 1, Mother argues:

***The trial court erred in terminating the parental rights of Mother when Mother was not afforded effective assistance of counsel because Mother was deprived of a meaningful hearing by the trial court conducting the hearing, contrary to Mo. Const. Art. I., Sect. 14 and over the objection of Mother, using a masked and physically distanced, multi-party, hybrid video-conference and video-and-phone-conference system, which prevented participants (including the trial court judge) from having awareness of who was participating in the hearing, hearing the hearing, seeing one another, interacting with the*** [sic] ***one another during the hearing, voicing objections, having objections heard, obtaining rulings on objections, being heard by the trial court judge, assuring the enforcement on the rule on witnesses observing the testimony of other witnesses, and otherwise using technology and procedures frustrating the hearing.***

Under section 211.462.2, a parent in a termination-of-parental-rights case is entitled to counsel.  "This statutory right to counsel includes an implied right to effective assistance of counsel." ***Interest of A.R.B.***, 586 S.W.3d 846, 861 (Mo. App. W.D. 2019).  When a parent claims he or she received ineffective assistance of counsel, the test is whether the attorney was effective in providing his client with a meaningful hearing based on the record. ***In Interest of F.M.***, 979 S.W.2d 944, 946 (Mo. App. S.D. 1998).

While Mother's point claims she did not receive effective assistance of counsel, her argument is wholly devoid of any facts demonstrating she did not receive a meaningful hearing. She does not direct our attention to any instance where counsel failed to present evidence, failed to object, failed to cross-examine witnesses, or failed to prepare for trial.[4]  Indeed, a review of the 1000+ page transcript reveals Mother's counsel called multiple witnesses on Mother's

---

[4] *See* e.g., ***In Interest of J.C., Jr.***, 781 S.W.2d 226, 228-29 (Mo. App. W.D 1989) (finding counsel ineffective where counsel was entirely passive, stipulated to the wholesale admission of all reports and records, waived the right to cross-examine the authors of the reports and called no witnesses); ***In Interest of J.M.B.***, 939 S.W.2d 53, 56 (Mo. App. E.D. 1997) (finding counsel ineffective where counsel did little beyond appear for the hearing, presented no evidence on behalf of his client, offered no argument for his client, and agreed that Mother's rights should be terminated); and *c.f.* ***Interest of P.J.T.***, No. SD36997, 2021 WL 5355228, at *6 (Mo. App. S.D. Nov. 17, 2021) (finding no ineffective assistance of counsel where counsel conducted an extensive cross-examination and presented evidence on client's behalf).

behalf, presented evidence, cross-examined witnesses, and advocated Mother's position.[5]

Rather, Mother argues the hearing was defective because the hearing was virtual. While her point claims the virtual nature of the hearing deprived her from hearing the evidence and being heard by the judge, Mother's argument provides no citations or examples of any instance where such a defect actually existed.[6] Instead, Mother relies on unsupported factual assertions that are not reflected in the record, which we cannot accept as true.[7] *See* **State ex inf. Riederer ex rel. Pershing Square Redevelopment Corp. v. Collins**, 799 S.W.2d 644, 652 (Mo. App. W.D. 1990) ("This [C]ourt will not accept as true unsupported factual allegations contained in appellate briefs.").

The record before us contradicts Mother's claim that she did not receive a meaningful hearing. It reveals a multiple-day hearing where Mother's counsel cross-examined witnesses, objected to testimony and evidence, presented witnesses, and advocated on Mother's behalf—a meaningful hearing where her position was argued and heard.[8] Mother does not demonstrate how counsel failed to provide her a meaningful hearing. Point 1 is denied.

### Point 4: Failing to Require Certification of Connection Status

In point 4, Mother argues:

> **The trial court erred in failing to make a record of the proceedings and evidence necessary to the determination of all questions to be presented to the appellate court for decision by failing to require certification of connection status of participants.**

---

[5] In fact, Mother praises trial counsel's "valiant efforts" as being "beyond reproach."

[6] We are aware of no instances in the transcript where the court reporter, trial judge, attorneys, or any party could not hear the evidence. "Court reporters can make known an inability to hear testimony and other matters so that statements that would otherwise be 'inaudible' may be restated." **State v. Koenig**, 115 S.W.3d 408, 418 (Mo. App. S.D. 2003) (J. Parrish, concurring).

[7] If there were issues with hearing evidence or presenting her case, Mother's counsel should have alerted the trial court of the issue at the first opportunity, giving the trial court the opportunity to have the court reporter read back the testimony for everyone to hear. *See* **Courtright v. O'Reilly Auto.**, 604 S.W.3d 694, 706 (Mo. App. W.D. 2020) ("Missouri law requires parties to give the trial court an opportunity to correct the error alleged.")

[8] Termination of parental rights cases are *civil* proceedings. **In re W.J.S.M.**, 231 S.W.3d 278, 282 (Mo. App. E.D. 2007). While the interest at stake is great, "there is no statutory or common law right to be present and the proceeding is not per se defective where presence is not feasible." **Id.** (quoting **H.W.S. v. C.T.**, 827 S.W.2d 237, 242 (Mo. App. E.D.1992)).

16

According to Mother, the court must include a certification of connection status for the record to be complete.[9]  However, Mother points us to no authority supporting her argument.  In fact, Rule 81.12(c)(5) contains no such requirement:

> *Certification of the Transcript.*  If the trial proceedings are recorded by a court reporter present at the time of such proceedings, the transcript shall be certified by the court reporter as a true and accurate reproduction of the proceedings transcribed.  If the trial proceedings are recorded by means of an electronic sound recording, the transcript shall be certified by the transcriber as a true and accurate reproduction of the sound recording.

Mother's argument consists of bare legal conclusions that lack any supporting rational or legal analysis.  "Mere conclusions and the failure to develop an argument with support from legal authority preserve nothing for review."  *Wallace v. Frazier*, 546 S.W.3d 624, 628 (Mo. App. W.D. 2018) (internal quotation omitted).  Again, it is not our duty to supplement a deficient brief with our own research.  *Burgan*, 618 S.W.3d at 716.  Because Mother does not support her claim with citation to any authority or legal analysis, this point is not preserved for our review.[10]  Point 4 is denied.

## Conclusion

The trial court's judgment is affirmed.

MARY W. SHEFFIELD, P.J., - OPINION AUTHOR

DON E. BURRELL, J. – CONCURS

JENNIFER R. GROWCOCK, J. – CONCURS

---

[9] Mother cites to one page in the 1000+ page transcript where counsel for the Division comments that she no longer sees the judge, says "Oh[,] There he is" and the judge says "go ahead."  Mother fails to cite us to anywhere in the judgment where the trial judge did not hear the evidence nor to any gaps in the transcript to support this claim.

[10] Rule 81.12(f) provides a process for correcting omissions in a transcript and imposes a duty on an appellant to use it.  *Interest of C.I.G.*, 616 S.W.3d 758, 764 (Mo. App. S.D. 2021).  Even if a record on appeal is incomplete, reversal is only warranted if "the appellant can demonstrate that (1) due diligence was employed in an attempt to correct the shortcomings and (2) the incomplete nature of the record prejudiced him."  *Id.* (quoting *St. Louis Cty. v. River Bend Estates Homeowners' Ass'n*, 408 S.W.3d 116, 122 (Mo. banc 2013)).  Here, Mother has failed to make either showing.

17